CROWN ZELLERBACH CORPORATION, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 15904.

United States Court of Appeals Ninth Circuit.

June 5, 1961.

Rehearing Denied Dec. 22, 1961.

Arthur H. Dean, Howard T. Milman, Marvin Schwartz and Jerome Gotkin, New York City, and Philip S. Ehrlich, San Francisco, Cal. (Sullivan & Cromwell, New York City, of counsel), for petitioner.

Earl W. Kintner, Gen. Counsel, James E. Corkey, Asst. Gen. Counsel, James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Washington, D. C. (Alan B. Hobbes, Asst. Gen. Counsel, and Frederick H. Mayer, Atty., Federal Trade Commission, Washington, D. C., on oral argument), and Gerald Harwood, Atty., Federal Trade Commission, Washington, D. C., for respondent.

Before POPE, MAGRUDER and MERRILL, Circuit Judges.

POPE, Circuit Judge.

In June, 1953, the petitioner Crown Zellerbach Corporation acquired the stock and assets of St. Helens Pulp and Paper Company. On February 15, 1954, the Federal Trade Commission filed a complaint against the petitioner charging that such acquisition of St. Helens by Crown Zellerbach was a violation of § 7 of the Clayton Act, (15 U.S.C.A. § 18) as amended and approved December 29, 1950,[1] in that "the effect of the aforesaid acquisition by respondent [Crown Zellerbach] of control of St. Helens may be substantially to lessen competition or to tend to create a monopoly in the lines of commerce, as 'commerce' is defined in the Clayton Act, in which respondent and St. Helens were engaged in the Western States and more particularly in the Pacific Coast States of the United States, and in each of them."

After answer was filed admitting the acquisition but denying that such acquisition violated § 7 of the Act, hearings were held before an Examiner from January 10, 1955 to November 20, 1956. The Examiner found that the allegations of the complaint had been sustained. Upon appeal the Commission made findings of its own modifying certain of the findings of the Examiner, but adopting the Examiner's conclusions that the acquisition "had the effect of substantially lessening competition and tending to create a monopoly in the relevant line of commerce in violation of Section 7 of the Clayton Act, as amended." A final order of divestment was issued December 26, 1957, and this petition for review followed.

Both Crown Zellerbach Corporation, here called Crown, and St. Helens Pulp and Paper Company, here called St. Helens, were corporations engaged in the manufacture of pulp and paper and the sale of paper and paper products through much of the West.[2] At the time of the acquisition of St. Helens, Crown was the

---

[1] § 18: "* * * No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

[2] By the "West" unless otherwise qualified, we refer to the Bureau of the Census definition of that region which includes the Pacific Coast states (Washington, Oregon, California), and the Mountain states (Montana, Idaho, Wyoming, Colorado, New Mexico, Arizona, Utah, Nevada).

largest pulp and paper company in that area and one of the largest in the nation. It carried on a fully integrated operation from timber lands and logging operations through the production and distribution of paper and paper products. It had timber holdings consisting of approximately 500,000 acres owned in fee in Washington and Oregon and cutting rights on approximately 20,000 acres, managing its timber lands on a sustained yield basis. Zellerbach Paper Company, a wholly owned subsidiary, was a large seller of paper products, the larger portion of which were bought from Crown.[3]

In 1953 Crown produced pulp and paper at its mills in Oregon and Washington. These were located at Camas, Washington; West Lynn, Oregon; Port Angeles, Washington; Lebanon, Oregon; and Port Townsend, Washington. During the time this case was under consideration before the Commission, it was preparing for production at another mill at Antioch, California. It owned 99 percent of Crown Zellerbach Canada, Limited, a fully integrated pulp and paper mill in Canada, and also had large timber holdings in Canada. It had facilities for converting portions of its paper production into paper products at some of the mills above listed, and also at Harlingen, Texas; North Portland, Oregon; and San Leandro and Los Angeles, California. While the case was pending before the Commission it acquired through another merger mills at Bogalusa, Louisiana; Baltimore, Ohio, and Dresden, Ohio.

St. Helens was also a fully integrated pulp and paper mill having a capacity of 180 tons of paper a day. It had 117,000 acres of high quality timber land and important cutting rights. Its mill was located at St. Helens, Oregon.

In making its inquiry as to whether the merger here accomplished fell within the prohibition of § 7, the Commission was confronted initially with the task of determining what was the relevant market, both as respects products and as concerns geographical area. This was a necessary step precedent to determining whether within that market there was a probability that the effect of the acquisition of St. Helens by Crown would be substantially to lessen competition or to tend to create a monopoly. The Commission held that "the coarse paper line relating generally to coarse wrapping papers, bag and sack papers and convertible papers is a sufficiently distinct product line to be a 'line of commerce' within the meaning of Section 7." With respect to geographical market, it held that "the Eleven Western States,[4] as found by the hearing examiner, is an appropriate section."

In order to review those determinations we must first inquire, after an examination of the record, as to the products with respect to which Crown and St. Helens competed, and the location and area of that competition. The question is just where these parties met in the paper and paper product market.

In general, grades of paper fall within three separate categories: namely, coarse, fine and newsprint. St. Helens was a coarse paper producer. Crown produced and sold a very complete line of paper and paper products, many of which were not produced or sold by St. Helens. Included in this line were newsprint, groundwood paper, machine-coated printing and converting paper, and fine paper. On the other hand, both Crown and St. Helens produced and sold, in competition with each other certain varieties of coarse papers including wrapping paper, shipping sack paper, bag paper, envelope paper, gumming paper, waxing paper, and other converting paper.

Generally speaking, in the trade and in the classifications of paper listed by the Bureau of Census, all coarse papers known to the trade are listed in various groups. What these are are disclosed in

3. Crown owned a substantial interest, nearly 50 percent, in Fibreboard Products, Inc., a paper and paperboard producer, which it sold in 1956.

4. Composing the "West" as previously defined.

the petitioner's brief under Table VI which shows the production in the United States in the year 1953 of all trade coarse paper. That table is as follows:

"Table VI

1953 Trade Coarse Paper Production in the United States by Census Classifications and Principal Grades Thereof

| (Tons of 2,000 Pounds) | United States |
|---|---|
| TOTAL TRADE COARSE PAPER | 17,749,333 |
| Census coarse paper | 3,392,000 |
|     Wrapping paper | 634,409 |
|     Shipping sack paper | 749,443 |
|     Bag paper | 895,949 |
|     Envelope paper | 119,746 |
|     Gumming paper | 94,541 |
|     Waxing paper | 223,177 |
|     Other converting paper | 516,413 |
|     Other | 158,322 |
| Census special industrial paper | 554,396 |
|     Tabulating card stock | 118,653 |
|     File folder stock | 25,718 |
|     Log stock | 104,507 |
|     Vulcanizing fibre stock | 28,668 |
|     Resin impregnated stock | 38,862 |
|     Other | 237,988 |
| Census sanitary tissue stock | 1,277,694 |
|     Toweling stock | 296,952 |
|     Toilet tissue stock (regular and facial tissue types) | 607,114 |
|     Napkin stock (regular and facial tissue types) | 149,283 |
|     Facial tissue stock (other than napkin and toilet stock e. g. handkerchiefs) | 180,284 |
|     Other | 44,061 |
| Census tissue paper, except sanitary and thin | 230,959 |
|     Wrapping tissue | 51,877 |
|     Waxing tissue stock | 103,647 |
|     Fruit and vegetable wraps | 22,282 |
|     Other | 53,153 |
| Census container board | 6,616,889 |
|     Liners | 4,412,745 |
|     Corrugating material | 1,906,116 |
|     Other | 298,028 |
| Census bending board | 3,566,683 |
|     Folding boxboard stock | 2,429,143 |
|     Special food board | 967,899 |
|     Other | 169,641 |
| Census nonbending board | 950,293 |
|     Setup boxboard, unpasted | 763,341 |
|     Other | 186,952 |
| Census special paperboard stock | 1,085,204 |
|     Tube stock | 229,260 |
|     Liner for gypsum and plaster board | 459,572 |
|     Other | 396,372 |
| Census cardboard | 75,215" |

It will be noted that the first listed categories of coarse paper are grouped under the heading "Census coarse paper", which includes the papers sold by St. Helens. Although the other groups listed, such as "special industrial paper" are also coarse papers, yet for classification in the Census statistics only the categories just named are called Census coarse paper.

The Examiner found that in the year 1953, the year of the acquisition of St. Helens, about 84 percent, or 48,155 tons of St. Helens' total production was made up of various of these listed grades of paper which the Census chose to designate as Census coarse paper.

Finding that Crown produced 51.5 percent of the total of these so-called Census coarse papers produced in the West, the Examiner concluded that "the line of commerce involved in this proceeding is the various papers falling within the Census category of coarse papers." The Commission agreed.[5]

The petitioner attacks this determination of these papers as constituting the relevant line of commerce, product-wise, and asserts that all trade coarse papers as listed in the table, supra, constitute the product dimension of the relevant market. Petitioner says that the papers designated as constituting a relevant market by the Commission, although they

5. "In this connection, a question for determination is whether or not the coarse paper line, including wrapping, bag and sack papers and converting papers, which the hearing examiner refers to as Census coarse papers, is a 'line of commerce' within the meaning of the Clayton Act.

"All such papers are in a relatively allied line, particularly in respect to markets and end uses. They generally relate to the packaging and wrapping field where a flexible type packaging material is appropriate or desirable. Wrapping papers, as the name implies, are made and used primarily for wrapping; they are produced in many sizes, colors, finishes, weights and other specifications appropriate for this field. Similar considerations apply as to bag and sack papers and other converting papers. Such factors as physical characteristics, markets, prices, and uses, all or in part tend to distinguish these papers from other papers and paperboard.

"Distinctions among individual types of paper or paperboard are readily apparent. As an example, one of the papers which respondent would include with the relevant product is container board, a separate category in the broad line of trade coarse papers. Container board is used in the manufacture of boxes, particularly the corrugated paper box. This is ordinarily a heavier paper than the usual run of wrapping and bag papers. Container board also utilizes a high proportion of waste paper as compared with the coarse wrapping and bag papers, resulting generally in a lower quality paper. In addition, these particular papers involve different markets. Container board is made into boxes and

sold to manufacturers of products requiring strong, lightweight shipping containers. Wrapping papers and bags (the converted product) are generaly sold in markets which include paper jobbers, wholesalers, such as grocery wholesalers, and large consumers, such as chain grocers, ultimately to be used in large part by retailers for packaging or wrapping at the point of sale to the consumer. Moreover, there is evidence of price variations as between such categories of paper or paperboard. These and other differentiating factors illustrate the distinctiveness of the competitive fields involved in the broad trade coarse paper line.

"It is argued by the respondent that some of the papers in the coarse wrapping, bag, sack, and converting paper field are substantially similar to some of the papers in other fields and that since they may be used interchangeably, the product line of commerce should not be so narrowly defined. The nature of many papers indicates that they are unsuitable generally for any purpose other than that for which they are made, such as toilet tissue. On the other hand, some papers such as certain container boards and certain wrapping papers might replace each other in use, but the evidence indicates that there is little such substitution in actual practice.

"It is our opinion, in view of the foregoing consideration, that the coarse paper line relating generally to coarse wrapping papers, bag and sack papers and convertible papers is a sufficiently distinct product line to be a 'line of commerce' within the meaning of Section 7."

are listed under a single heading as "Census coarse paper" are not thereby proven to measure the product dimension of the relevant market in that they are grouped together by the Census merely for statistical reasons and that the Census grouping means nothing; that the grades selected by the Commission have little relation to each other and serve many diverse uses, while on the other hand, there is a greater degree of substitutability between the so-called Census coarse papers and other trade coarse papers than among ordinary Census coarse papers themselves; that all trade coarse papers are made from the same raw materials in the same mills on the same machines and this production flexibility requires that all trade coarse papers should be included in the relevant market.

As for the argument that the Census classification does not settle what constitutes a relevant market, we agree. At the same time we must recognize that it is possible that this grouping has behind it some facts or circumstances relating to the paper industry which may have led to the grouping originally although it is not specifically named or designated in the Census report. Such circumstances may or may not have some bearing upon the question of what may be the relevant market here. Hereafter we shall have occasion to discuss specifically the other reasons given by petitioner for making all trade coarse papers as listed in the table above a part of the relevant market, such as the flexibility in production, the substitutability of use, etc. But at this point we think it plain that what is important as an aid to the determination of what is the relevant market is a consideration of what are the facts concerning competition in the market place. To that we address our attention.

We begin with what the record shows as to how St. Helens operated; what products it sold; where it sold those products; to what extent this constituted competition with the petitioner and others; what other producers were selling the same products in the same market; and, relative to all other suppliers of these products in the same area, how much of a competitive factor St. Helens was. Of course the patterns of trade carried on by St. Helens alone do not furnish the entire answer in our effort to discover the patterns of trade in the paper industry which were followed in practice, from which the Board must determine the relevant market; but what St. Helens produced and sold in competition with other paper manufacturers, and particularly in competition with the petitioner, furnishes the best place to begin; and it is manifest that generally speaking we must find the relevant market product-wise in those products in which St. Helens was a significant factor before the merger. Thus St. Helens produced no newsprint nor fine paper, and plainly enough, those types and grades do not figure here.

We turn now to the statistics shown in the record for the answers to these questions. Initially we inquire about volume of production of the paper categories mentioned, namely, those grouped under the heading Census coarse paper in table VI above. In the West, in the year 1953, the total production of these papers, that is to say, wrapping paper, shipping sack paper, etc., was 437,384 tons. Of this quantity Crown produced 225,276 tons, or 51.5 percent of the total, and St. Helens produced 48,155 tons, or 11 percent of the total. The combined total of these two producers was thus 62.5 percent of the whole. It is conceded that the production of these papers by these concerns was substantially the same in the preceding year, 1952. During the year 1953, St. Helens also produced papers within the other categories listed on table VI, i. e., special industrial paper, sanitary tissue, tissue paper except sanitary, thin container board, bending board and special paper board. These papers were produced by St. Helens in comparatively small amounts. The production figures show that in 1953, the 48,155 tons of the so-called Census coarse papers constituted approximately 84 percent of St. Helens' production.

Petitioner criticises the use of these figures by the Examiner and the Commission to demonstrate that St. Helens' paper production fell predominantly and most significantly within the so-called coarse paper category, contending that production is not necessarily significant with respect to the amount or area of competition. It argues that the Commission's findings based upon production statistics are misleading because what is meaningful in ascertaining the extent and amount of competition which would be affected by the merger would be the sales statistics. It notes that much of the production of both companies was sold outside of the West and beyond the area of the country which the Commission treated as relevant to its decision in this case. We think it is correct to say that the sales statistics rather than production figures are generally speaking more significant in arriving at the relevant market both as respects product and geographical area. However, as hereafter noted, the problem as to the meaningful competition prior to the merger is not so simple as to be resolved solely by reference to sales.

While neither party here has compiled for us charts or tables showing their sales in the various geographical areas considered by the Commission, the information is nevertheless available in the record. These are shown for the year 1952 in tons and by states on the charts which we here attach. The charts include manufactured bags besides the listed papers shown under the heading of Census coarse paper in Table VI. The reason for the inclusion of bags we explain shortly. The first chart, Chart A, relates to Crown. The second chart, Chart B, relates to St. Helens. (Since these charts have been compiled by us from the record, an explanation of their sources is given in Appendices A and B.)

## CHART A

CROWN-ZELLERBACH'S 1952 SALES IN TONS, BY STATES, OF 7 "CENSUS COARSE PAPERS", PLUS BAGS

| (Chart A) | Cal. | Ore. | Wash. | Idaho | Nev. | Mont. | Wyo. | Colo. | Utah | Ariz. | N. Mex. | Total sales, by item from statistics on this chart | Sales, 11 West. states, as shown on chart, gov't brief face page 145 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wrapping paper | 20,920.9 tons | 3,234.4 tons | 4,022.3 tons | 443.2 tons | 238.5 tons | 583.1 tons | 131.7 tons | 2,160.4 tons | 1,858.5 tons | 445.1 tons | 372.7 tons | 34,410.8 tons | 34,417 |
| Shipping—Sack paper | [Crown converted most such paper into sacks. No area breakdown of sales is given, but the table on p. 33 of Crown's opening brief indicates its total sales of this grade, exclusive of sales to Zellerbach, in the eleven western states were 6,264 tons.] | | | | | | | | | | | 6,264 tons | -0- |
| Bag paper | 19,568.9 tons | 221.1 tons | 2,627.0 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 22,417.0 tons | 22,417 |
| Envelope paper | 3,554.4 tons | 278.0 tons | 19.2 tons | -0- | -0- | -0- | -0- | 201.6 tons | -0- | 28.8 tons | -0- | 4,082.0 tons | 4,082 |
| Gumming papers | 2,072.6 tons | 3,597.9 tons | 3.9 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 5,674.4 tons | 5,674 |
| Waxing papers | 18,279.7 tons | 8,199.5 tons | 1,642.6 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 28,121.8 tons | 28,122 |
| "Other converting" papers | 7,859.8 tons | 1,323.9 tons | 2,010.2 tons | 55.5 tons | -0- | 160.8 tons | -0- | 549.3 tons | 7.8 tons | 421.4 tons | 48.7 tons | 12,437.9 tons | ? |
| Total sales, by State, of Census papers on this chart | 72,255.8 tons | 16,854.8 tons | 10,325.2 tons | 498.7 tons | 288.5 tons | 743.9 tons | 131.7 tons | 2,911.8 tons | 1,866.3 tons | 895.3 tons | 421.4 tons | inapplicable | inapplicable |
| "Comparable" totals from Crown opening brief pp. 213-214 (excluding "other converting") | 37,408 | 2,905 | 7,046 | 227 | 27 | 568 | 113 | 2,362 | 1,578 | 317 | 380 | inapplicable | inapplicable |
| Manufactured bags (excluding lunch, garbage, & sandwich bags.) [In tons & bales] | 35,499.09 tons | 4,035.38 tons | 6,538.71 tons | 786.40 tons | 335.48 tons | 1,111.12 tons | 197.54 tons | 2,874.73 tons | 2,630.54 tons | 1,203.89 tons | 742.30 tons | 55,955.18 tons | inapplicable |
| | 1,154,442 bales | 131,232 bales | 212,641 bales | 25,574 bales | 10,910 bales | 36,134 bales | 6,424 bales | 93,487 bales | 85,546 bales | 39,151 bales | 24,140 bales | 1,819,681 bales | |
| Impregnated bags (lunch, garbage, etc.) | 150,897 cases | 11,317 cases | 26,043 cases | 677 cases | 340 cases | 1,087 cases | 176 cases | 7,699 cases | 2,953 cases | 5,870 cases | 406 cases | 207,465 cases | inapplicable |

810

## ST. HELENS' 1952 SALES IN TONS, BY STATE, OF 7 "CENSUS COARSE" PAPERS, PLUS MFG'D BAGS

| (Chart B) | Calif. | Ore. | Wash. | Idaho | Nev. | Mont. | Wyo. | Colo. | Utah | Ariz. | N.Mex. | Total sales by item, from statistics on this chart | Sales, 11 Western states (for comparison), from chart on gov't brief 145 face |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wrapping paper | 8,604.87 tons | 1,916.07 tons | 1,772.03 tons | 78.08 tons | -0- | 190.91 tons | 7.60 tons | 210.28 tons | 264.19 tons | 529.03 tons | 45.66 tons | 13,618.72 | 13,375 |
| Shipping—Sack paper | 2,897.95 tons | -0- | 2,823.58 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 5,721.53 | 5,722 |
| Bag paper | 570.19 tons | 21.48 tons | 117.94 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 709.61 | 775 |
| Envelope paper | 2,316.11 tons | 309.69 tons | 249.42 tons | -0- | -0- | -0- | -0- | 445.34 tons | 1.23 tons | -0- | -0- | 3,321.79 | 3,322 |
| Gumming paper | 695.01 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 695.01 | 695 |
| Waxing paper | 1,284.94 tons | -0- | 281.81 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 1,566.75 | 1,807 |
| "Other converting" papers | 895.48 tons | 260.14 tons | 215.39 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 1,371.01 | 3,511 |
| Total sales, by state, of Census coarse papers | 17,264.55 tons | 2,507.38 tons | 5,460.17 tons | 78.08 tons | -0- | 190.91 tons | 7.60 tons | 655.62 tons | 265.42 tons | 529.03 tons | 45.66 tons | inapplicable | inapplicable |
| Comparable totals from Crown opening brief page 211 (state sales chart) | 16,874 tons | 2,523 | 5,584 | 78 | -0- | 138 | 8 | 656 | 270 | 533 | 46 | inapplicable | inapplicable |
| Manufactured bags (excluding waxed & sanitary) | 3,370.57 tons | 1,181.39 tons | 2,411.36 tons | 93.14 tons | -0- | 153.14 tons | 76.44 tons | 92.48 tons | 563.81 tons | 873.87 tons | 68.76 tons | 8,834.96 | inapplicable |
| Waxed & sanitary Manufactured bags | 2.16 tons | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 2.16 | inapplicable |

During the years to which we have referred St. Helens produced and sold as a converted paper product a substantial quantity of bags. Its sales of other converted products were relatively insignificant.[6]

Chart B, showing St. Helens' 1952 sales of Census coarse papers and manufactured bags by state, discloses precisely where St. Helens was a potential competitor. Thus it sold 12,292.97 tons of wrapping paper in that year in the three Pacific Coast states of California, Oregon and Washington. In the same period and area it sold 5,721.53 tons of shipping sack paper, 6,913.32 tons of manufactured bags, and 2,875.22 tons of envelope paper. In that period also it sold substantial, though lesser, quantities of the other categories of what the Examiner called Census coarse papers; and the record justifies the Commission's conclusions that this was not only potential but actual competition. The direction and vigor of that competition we shall discuss hereafter.

Obviously to begin an inquiry as to the relevant market involved here, the initial inquiry must be as to what products St. Helens sold in the competitive market and where those products were sold. All this of course is preliminary to the inquiry which we must reach later in this opinion as to what effect the absorption of St. Helens had upon competition in that market.

It was competent for the Commission in arriving at its conclusion as to the effect of the merger on competition, to confine its consideration of the relevant market, product-wise, to those products which were mainly and principally the products sold by the absorbed company. We know of no rule which would require that the Commission include in its designated relevant product market every item sold by St. Helens regardless of its size or importance. All that the Commission was required to do was to ascertain and find a product line which was sufficiently inclusive to be meaningful in terms of trade realities.

6. Petitioner has supplied us with Table IV as follows:

"TABLE IV

St. Helens' 1952 Sales of Trade Coarse Papers and Converted Paper
Products Other Than Those Classified as Census Coarse Paper
(the Commission's Line of Commerce)

|  | Sales In Tons |
|---|---|
| Bags | 9,333 |
| Towels | 1,177 |
| Toweling | 4 |
| Waxed papers (salmon featherweight; bleached; unbleached and interfolded sealwell; waxed BleKraft butcher) | 441 |
| Fibre can kranila | 609 |
| Hickory cover stock | 159 |
| Raisin tray | 620 |
| Kranila tagboard | 1,848 |
| SnoKraft tagboard | 51 |
| Canco converting | 1,844 |
| Salesbook kranila | 330 |
| Filler tape | 21 |
| Fruit and vegetable wrap (including Kranila Safe-T-Wrap) | 169 |
| Linerboard | 408 |
| Total | 17,014 |
| Total Sales, All Grades and Products | 52,516 |
| Total Sales, Census Coarse Paper Grades | 35,502 |
| Percent of Sales Other Than Census Coarse Paper | 32%" |

(If the item of bags is added to the Census coarse paper as a part of the relevant market then the total sales including Census coarse paper and bags would equal 44,835 tons or 85.37 percent of St. Helens' 1952 sales. These figures exceed those shown on Chart B because they include all sales of all products everywhere.)

If it were otherwise, it would be a practical impossibility to apply the prohibitions of § 7 in the case of an absorbed concern which produced a multitudinous number of inconsequential and minor products. In the statutory phrase "in any line of commerce", the word entitled to emphasis is "any". *Any* line of commerce does not mean the same as the entire line of commerce, or all lines of commerce engaged in or touched upon by the acquired concern. The line of commerce need not even be a large part of the business of any of the corporations involved.[7]

For example, if in the case involving an acquisition of a company manufacturing prosthetic devices it appeared that the company also manufactured and sold a limited quantity of shoes, it could hardly be argued that the relevant market must include or take into consideration all shoe manufacturers.

■■ What we must ultimately get at here is the question whether the effect of the acquisition "may be substantially to lessen competition". In reaching that point the Commission was required to find that the market affected was a distinct and a substantial one. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057. We cannot say that the product market here, whether it includes or excludes manufactured bags, did not meet that test.

■ In arguing that production flexibility creates a market including all coarse papers petitioner asserts that a single paper-making machine, particularly the Fourdrinier machine which is commonly used in all paper mills including St. Helens', is readily adapted or changed to produce other types of paper than the categories we have been here discussing, so that by simple adjustment in the machine it can be made to produce any type of trade coarse paper whether within or without the group selected by the Commission. It is said that a machine one day producing wrapping paper by such an adjustment may the next day be producing bleached paper board and food board. There is a question whether this statement is altogether accurate since it would appear that some such changes would depend upon alterations of or additions to the pulp before it ever enters the machine, but aside from that, we think that this so-called production flexibility upon which petitioner places such importance,[8] is not persuasive here.

The facts of the case show that St. Helens had been in business for a long time, with many established customers and selling through brokerage channels. What was turned out of the Fourdrinier machines depended altogether on what orders St. Helens had and what it knew it could sell. What those orders were and what it found a market for were presumably the products which it did sell. A similar contention made by the defendants in United States v. Bethlehem Steel Corporation, supra, was dealt with by Judge Weinfeld as follows: (168 F. Supp. at page 592) "The evidence establishes that the defendants' production flexibility or mill product line theory is indeed pure theory. In practice steel

7. Senate Report No. 1775, June 2, 1950, 81st Cong., 2nd sess., Vol. 2 U.S.Code Congressional Service, p. 4297: "It is intended that acquisitions which substantially lessen competition, as well as those which tend to create a monopoly, will be unlawful if they have the specified effect in any line of commerce, whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition." See also United States v. Bethlehem Steel Corporation; D.C., 168 F.Supp. 576, 595. "The phrase is comprehensive and means that if the forbidden effect or tendency is produced in *one* out of *all* the various lines of commerce, the words 'in *any* line of commerce' literally are satisfied." George Van Camp & Sons Co. v. American Can Co., 278 U.S. 245, 253, 49 S.Ct. 112, 113, 73 L.Ed. 311.

8. "This admitted fact of production flexibility is the dominant, unifying element for our case, and it requires the inclusion of all trade coarse papers within the product dimension of the relevant market."

producers have not been quick to shift from product to product in response to demand. Moreover, the evidence establishes that the continuing relationships between buyers and sellers in the steel industry make such shifts unlikely." And in a footnote the Judge continued: "While the steel producers may be able to shift their production from one product to another, the buyers obviously cannot so shift their purchases. A user of steel sheets cannot make do with bars, rods, pipe or plates. The only flexibility the buyer has is in the choice of the company from which he buys the product he needs. It is just such freedom of choice that § 7 is designed to protect and for that reason line of commerce must take into account buyers and uses." Such is the situation here.

Another contention made in support of petitioner's assertion that the relevant market here should include all trade coarse papers without any such limitation as that made by the Commission is that there is a large degree of substitutability in end use between Census coarse paper and other trade coarse papers. Says petitioner: "Uses do not distinguish papers classified within Census coarse paper from other trade coarse papers."

We have great difficulty in following this argument. In the first place, as we have indicated above, if the Commission found that St. Helens produced and marketed within a relevant area large amounts of wrapping paper but comparatively minor amounts of paperboard, it could properly exclude the latter items from the relevant market. The absorption of St. Helens would be unlikely to have an important effect upon competition in respect to a comparatively minor product. However, beyond that, the Commission found that the papers listed by it as a part of its relevant market served different purposes, had different physical characteristics, were composed of different quality paper, and had different end uses than those which petitioner would have included within the relevant market. It seems obvious to us that there are essential and notable differences between flexible wrapping paper on the one hand and paperboard used for shipping containers on the other. The finding of the Commission just referred to was based upon a substantial amount of evidence in the record which supports these conclusions.

Flexible wrapping paper, familiar to shoppers who observe the storekeeper wrap up merchandise for delivery to customers, could very properly be found to have different characteristics, uses and markets than paperboard used for boxes and cartons sold in the crate type container market. Certainly it is not within our competence to undertake to correct the finding of the Commission on this point simply because all these products are made from paper, or because both wrapping paper and paper cartons are used to enclose merchandise. For example, it does not follow that because shirts and sweaters are both made of cloth and used as clothing, shirts alone could not in a proper case be treated as constituting a separate but relevant market.

Perhaps the most persuasive fact in support of the Commission's classification and its treatment of these Census coarse papers as distinguishable and something different from other coarse papers is the fact that as a practical matter no one in the industry or interested in it or having anything to do with it has any difficulty in distinguishing one type of paper from the other. For instance, no one questions the types or categories of papers produced by St. Helens as shown in the above Chart B relating to St. Helens' 1952 sales by states. The same is true of the types of paper in the similar chart relating to Crown's sales. The Census classification cannot be meaningless—there must be factual differences on which that classification is made; and in respondent's Exhibit 92A, a report by the Stanford Research Institute on "The Future of Paper in the United States", there is a discussion of these Census coarse papers dealing with each item of this category and outlining the production, increase or decrease of

production, uses, and demands of each. Thus it notes a decline from 1940 to 1953 of the consumption of wrapping paper; a major increase during the same period in the production of bag paper; and very large increases in use of both shipping sack paper and converting coarse paper. In discussing the increased consumption of shipping sack paper, the study notes how shipping sacks produced therefrom are used mainly for shipment of such materials as fertilizers, cement, lime, salt, plaster, sand, and commercial feeds, flour, sugar, rice and potatoes. Obviously the producers of this study had no reason to assume that these sacks made from shipping sack paper were indistinguishable from corrugated or paperboard cartons. And the authors of the survey obviously considered they were discussing plainly distinguishable and identifiable items.

The effort to establish that all trade coarse papers should be included within the relevant market on the basis of their being substitutable or interchangeable in end use with the products listed under Census coarse paper is, we think, put forward in an effort to apply such cases as United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, and United States v. Columbia Steel Company, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. We think that those cases are not relevant here.[9]

■ The problem which arises in a case involving § 7 of the Clayton Act is a very different one. There the Commission must determine "in any line of commerce in any section of the country" what merger may substantially lessen competition, or tend to create a monopoly. As suggested in United States v. Bethlehem Steel Corporation, supra, (note 36, 168 F.Supp. at page 593), " * * * when the question is power over price, substitute products may be relevant because they can limit that power. The issue under § 7 of the Clayton Act is not whether a merger may result in a company having power over price or the power to exclude competition. The issue under § 7 is whether there is a reasonable probability of substantial lessening of competition. There can be a substantial lessening of competition with respect to a product whether or not there are reasonably interchangeable substitutes."

■ In addition, the contention of interchangeable or substitutable products here is simply not borne out by the facts. In any event the issue under the Act here involved is quite different from that arising under § 2 of the Sherman Act.[10] As for the Columbia Steel Company case, supra, that case involved an attack upon an acquisition under § 1 of the Sherman Act, 15 U.S.C.A. § 1, and the case represents an application of tests of liability under the standards set by the Sherman Act. The legislative history of § 7, both as originally enacted and as amended, discloses that § 7 was intended to cover more than was prohibited by the Sherman Act and to cope with monopolistic tendencies in their incipien-

9. In the duPont case, the defendant, which dealt in cellophane, was charged with monopolizing and conspiracy to monopolize interstate commerce under § 2 of the Sherman Act, 15 U.S.C.A. § 2. The Court noted that there were various flexible wrapping materials bought by manufacturers for packaging their goods; that although cellophane differed from the others "from some it differs more than from others". It noted that cellophane shared the packaging market with others in such manner that cellophane accounted for 17.9 percent of the flexible wrapping materials; that duPont had lost considerable portions of this packaging business to other products. It held that cellophane's interchangeability with other materials sufficed to make it a part of this flexible packaging material market which was the relevant market, not cellophane alone.

10. American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 259 F.2d 524, a case arising under § 7 of the Clayton Act, treated the relevant market there as including both beet and sugar cane. There, as the court noted, the two kinds of sugar were for all practical purposes substantially identical.

cy and well before they have attained effects which would justify a Sherman Act proceeding. In substance, the purpose of § 7 was to get away from the use of the standards applied in the Columbia Steel Company case itself. We are in agreement with the comments of Judge Weinfeld in United States v. Bethlehem Steel Corporation, supra, as to the inapplicability of the reasoning of the Columbia Steel Company case in a case arising under § 7 of the Clayton Act. (Footnote 34, 168 F.Supp. at page 592.)

Nothing illustrates this better than United States v. E. I. du Pont de Nemours Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057. There concededly du Pont produced many finishes and many fabrics of which those sold to General Motors, the customer, represented but a small percent. Thus it is stated the fabric sales to General Motors comprised 1.6 percent of the total market for the type of fabric used by the automobile industry; yet the relevant market was determined to be not coextensive with the total market for finishes and fabrics but coextensive with the automobile industry, the relevant market for automotive finishes and fabrics. Unquestionably the fact that General Motors, the customer, chose to buy these particular finishes and fabrics, sufficiently distinguished them so that they constituted by themselves the relevant market. Here, as the record and the statistics show, the customers of St. Helens, and the customers of Crown, in ordering and purchasing papers designated as wrapping paper, shipping sack paper, bag paper, envelope paper, etc., by that very

fact, demonstrate and create a market for those specific products so that they collectively may properly identify the relevant market here involved.

Without here delineating or outlining the very extensive testimony and the numerous exhibits in the record tending to show that these items of Census coarse paper differed in end use and in physical characteristics in the available markets from the other coarse papers, it is sufficient to say and hold that the findings of the Commission to the effect that they constituted a distinct line of commerce are not clearly erroneous.[11]

In noting that the extent of the relevant market is determined by the products in which the parties actually competed, we are drawn to the conclusion that we should include within that market sales of manufactured bags because, as previously suggested, that was a product which St. Helens produced and sold in substantial amounts. In tonnage it exceeded all other products of St. Helens with the exception of wrapping paper. Thus in the Pacific states alone St. Helens' sales of wrapping paper were 12,292.97 tons; its sales of manufactured bags were 6,913.32 tons; and next in order of tonnage was shipping sack paper, 5,721.53 tons.

Ultimately we must arrive at a conclusion as to whether the taking over of St. Helens might have a substantial effect upon competition in the relevant market and that necessitates, as we have indicated, an ascertainment of just what part St. Helens had in the market—just how much a factor it was in competition. After we have evaluated St. Helens'

11. There is no suggestion here, as has sometimes been made, (see In the Matter of Pillsbury Mills, 50 F.T.C. 555, 564, 565), that because the Commission's "specialization and expertise" are peculiarly adapted to its intended task of policy "clarification and completion" our power to review these findings is more limited than our power to review findings of a court. See Davis, Administrative Law Treatise, § 29.02. We here apply the same "clearly erroneous" test, in the same manner as if the findings before us were those of a district court. The dual system of enforcement of § 7 makes any other treatment unthinkable. As suggested in the Report of the Attorney General's National Committee to study the Anti-trust Laws, p. 148, note 77: "Chaotic consequences might attend the anomaly of subjecting identical trade practices to different legal principles due to fortuitous circumstances determining whether a District Court or the Commission sits as the initial arbiter, in either event subject to appellate judicial review."

place in the whole market, that is to say, what part it had as respects other producers including Crown, we shall deal with the question whether our view that manufactured bags should be deemed a portion of the relevant product market calls for a different conclusion than that reached by the Commission on the basis of its assumption of a relevant market which did not include manufactured bags.

Before moving to another problem in this case, we think some reference should be made to Chart A, above, which sets forth Crown's 1952 sales in tons by state. When the sales of Crown are compared with sales by St. Helens for similar products, it will be noted in some cases that Crown's sales in relation to those of St. Helens do not disclose the same relative proportions as indicated by the statistics of production. As earlier noted, Crown produced 51.5 percent of all Census coarse papers manufactured in the West while St. Helens' share was only 11 percent, slightly more than one-fifth that of Crown. On the other hand, in sales of envelope paper Crown sold in the Pacific states 3,851.6 tons as against 2,857.22 tons for St. Helens. This is far from a five to one ratio. The reason for this is that Crown converted a substantial portion of its production of such papers; thus, as shown on Chart A, most of its shipping sack paper was converted into sacks. We find no available figures as to sales of shipping sack paper by Crown in the Pacific coast states.

This situation with respect to conversion of these products by Crown does not in any manner minimize the fact of competition between these two companies.[12] The facts were that St. Helens sold these papers to independent converters while Crown converted a larger percentage of its production of these same papers. The result was that Crown, or its wholly owned subsidiary, Zellerbach Paper Company, in selling the con-

verted product was in competition both with St. Helens and the latter's purchasing converters. This is one reason for our previous suggestion that the figures on production were not altogether irrelevant to the question of what competition existed prior to merger.

This brings us to a consideration of what the record shows as to the geographical area of the relevant market. Three possible areas are suggested by the parties or by the Commission in the process of their discussion of this problem. One such "section of the country" might be the Pacific states of California, Oregon and Washington; the Commission adopted the hearing examiner's finding that the eleven western states which we have heretofore called the West constitute a section of the country appropriate for ascertainment of the ultimate question of whether the acquisition of St. Helens might result in a substantial lessening of competition. This was the geographic relevant market selected by the Commission. The Commission did however say "the evidence is likewise sufficient to show that the three Pacific Coast States, California, Oregon and Washington, constitute a section of the country, within the meaning of Section 7, for much the same reasons. This is where the great bulk of the domestic sales, of the papers involved, by Crown and St. Helens were concentrated. For the purpose of this decision, however, the Eleven Western States will be regarded as the appropriate section."

Petitioner rejects both of these suggested areas, asserting that the relevant market embraces a substantially larger area and that it includes all states west of the Mississippi River.

We find great difficulty in going along with either party. It is true that two witnesses for respondent testified that Crown's principal markets were in the area west of the Mississippi River.[13] We think that the statistical record of sales

12. As we shall see later, the ultimate problem as to the effect of merger on competition is not primarily concerned merely with competition between the merged and the absorbing corporation.

13. From testimony of Witness Ticoulat: "Q. * * * In what area, geographical area, did your company compete with the St. Helens Pulp and Paper Co. in the sale of those papers that St. Helens pro-

fails to demonstrate any convincing factual situation which would require the Commission to accept all states west of the Mississippi River as the relevant market. The only item in the statistics which might point in the direction of petitioner's claim is the fact that Crown sold a very substantial quantity of Census coarse papers in the state of Texas. St. Helens also sold the same papers to the extent of 1223 tons in Texas in 1952.

On the basis of the evidence as to where these products were sold, we are of the opinion that the relevant market was in the three Pacific coast states. The statistical record shows that it was in those states that as between these two corporations the most active and extensive competition occurred.[14] In view of the location of the mills of these parties, the three Pacific coast states represent the area which could be best served and supplied by these producers.[15] This advantageous situation to supply the Pacific coast states necessarily operated in a number of ways. All points from Seattle to San Diego could be served more quickly from these mills than from elsewhere. A promptness in supplying orders is a well known factor in advantageous competition. Moreover this three-state market is one which, in the language of the Court of Appeals in American Crystal Sugar Co., supra, was subject to common economic forces; it is an area of extraordinarily rapid population growth, with large and growing cities, increasing industrial activities and other

growth factors which set it apart from other areas in the west. The availability of alternative water transportation, while little availed of, has operated to furnish peculiarly favorable land carrier rates.

The charts show that St. Helens' sales in those Pacific coast states of Census coarse paper plus manufactured bags aggregated 32,145.42 tons. As previously indicated, (footnote 6, supra,) petitioner computes St. Helens' total sales of Census coarse paper at 35,502 tons and its sales of bags at 9,333 tons, or a total of 44,835 tons. The 32,145.42 tons sold in the Pacific coast states was thus 71.7 percent of all its sales in those categories. This means that the predominant and outstanding market for St. Helens was in this three-state area.[16]

Again we note that the market in which St. Helens competed is of primary significance here because ultimately we are going to have to inquire what was the effect of withdrawing St. Helens as a market factor. All of this means that there is substantial reason for a conclusion that the three Pacific coast states would be properly treated as the area or section of the country in respect to which we are ultimately to inquire as to the tendency to lessen competition.

A further reference to Chart B showing St. Helens' 1952 sales in tons by state will indicate why we have difficulty in following the Commission's determination that the eleven Western states should be included in the geographical relevant market. Those charts show that in that

---

duced? A. In substantially all the areas that we sell in. Q. Which is what? A. Primarily west of the Mississippi and occasionally east, but primarily west of the Mississippi." The same witness added that Crown met St. Helens "very aggressively in the eleven western states."

14. American Crystal Sugar Company v. Cuban-American Sugar Co., D.C.S.D. N.Y., 152 F.Supp. 387, 397. "It is here that Colonial and Crystal concentrate their principal sales efforts. The evidence establishes that this contiguous area comprises a relevant market."

15. American Crystal Sugar Co. v. Cuban-American Sugar Co., 2d Cir., 259 F.2d 524, 529. "[The companies involved] were better situated to supply this territory than other more distant markets, and this locational advantage over refiners having more distant facilities each had sedulously developed by a program of aggressive competition in this area. * * "

16. The totals shown in the table in footnote 6, supra, included some sales in distant states such as New York and Texas, and some exports. The remoteness of these areas is the reason they are not included in the relevant "section of the country" here involved.

year St. Helens sold no shipping sack paper, bag paper, gumming paper, waxing paper, or other converting papers in Idaho, Montana, Nevada, Wyoming, Colorado, Utah, Arizona or New Mexico. It sold no paper products of any kind in that year in Nevada; it sold minimal quantities of manufactured bags in those same states, and no envelope paper in those Mountain states except in Colorado and Utah. In the light of that sort of record it seems to us that we are confronted with great difficulty in understanding how the acquisition of St. Helens could operate substantially to lessen competition in those areas where it apparently did no business before the acquisition. It would seem that there could not possibly be a lessening of a competition that was non-existent in those areas.

What effect our differing view as to the relevant geographic area has upon the final disposition of this case is something we shall discuss later.

We now come to the question whether, on the assumptions we have here made, it could be said by the Commission that "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." To answer it we must necessarily consider what the record shows as to the total competitive picture in this relevant area with respect to these products prior to the acquisition. If the acquisition took out of the market a concern whose total sales and competitive impact was so small relative to all sales and all competition in the market that it lacked real importance, then the acquisition cannot be said to affect competition in a substantial manner. Our purpose therefore is to ascertain what other local or Western producers and competitors there were and what part they had in this market and to what extent producers outside the West,—from the East, the North and the South, similarly operated and competed in this relevant market.

First as to the Western producers: in 1952 there were ten concerns which produced the papers here referred to, but an examination of the total production of the relevant products by these various companies will disclose that only four such concerns could possibly have a substantial part in the competition for sales. The 1952 production of these companies of the papers listed was as follows:

| "Company | 1952 Tons | Percent |
|---|---|---|
| Crown | 226,430 | 51.1 |
| St. Helens | 53,821 | 12.1 |
| Longview | 77,749 | 17.6 |
| St. Regis | 59,851 | 13.5 |
| Columbia River | 14,700 | 3.3 |
| Publishers | 7,471 | 1.7 |
| Potlatch | 1,400 | 0.3 |
| Inland Empire | 1,008 | 0.2 |
| Fibreboard | 435 | 0.1 |
| Simpson | 287 | 0.1 |
| Total | 443,152 | 100" |

It will be noted that the total production, wholly apart from sales, by all except the first four listed, namely, Crown, St. Helens, Longview, and St. Regis, is relatively small in amount and percentage. Columbia River, the largest of these so-called minor producers, manufactured in two mills, but the record as to what was sold and where is very unsatisfactory. But even if this firm's total production were assumed to represent sales of the relevant products in the market, the whole amount would not be enough to be an important factor in arriving at the conclusions toward which we are directing ourselves.[17]

We now attach Chart C showing 1952 sales in the Pacific states and in the West of the seven Census coarse papers plus manufactured bags by the four larger producers mentioned. A portion of the figures are taken from Charts A and B, supra. The others are explained in Appendix C.

17. The evidence shows that a total of 537 tons of wrapping paper sold in 1952 was disposed of as screenings and not sold as regular wrapping paper. It is impossible to make more than a rough estimate of Columbia River's sales in the Pacific coast states.

## CHART C

### 1952 SALES IN THE WEST OF 7 "CENSUS COARSE" PAPERS PLUS MANUFACTURED BAGS

| (Chart C) | Crown-Zellerbach | | St. Helens | | Longview Fibre | | St. Regis | |
|---|---|---|---|---|---|---|---|---|
| | Pacific States | Eleven Western States | Pacific States | Eleven Western States | Pacific States | Eleven Western States | Pacific States | Eleven Western States |
| Wrapping paper | 28,177.6 | 34,410.8 | 12,292.97 | 13,618.72 | 12,312.75 Est. | 16,417. | 1,136 | 1,136 |
| Shipping—Sack paper | 1,698 Est. | 6,264 | 5,721.53 | 5,721.53 | 18,572 | 18,572 | 13,267 | 13,267 |
| Bag paper | 22,417 | 22,417 | 709.61 | 709.61 | negligible | negligible | 3,270 | 3,270 |
| Envelope paper | 3,851.6 | 4,082 | 2,875.22 | 3,321.79 | –0– | –0– | –0– | –0– |
| Gumming paper | 5,674.4 | 5,674.4 | 695.01 | 695.01 | 441.65 Est. | 587 | –0– | –0– |
| Waxing paper | 28,121.8 | 28,121.8 | 1,566.75 | 1,566.75 | 371.2 | 371.2 | 223 | 223 |
| "Other converting" paper | 11,193.9 | 12,437.9 | 1,371.01 | 1,371.01 | 14,864.69 | 14,864.69 | 998 | 998 |
| Manufactured bags | 46,073.18 | 55,955.18 | 6,913.32 | 8,834.96 | 4,492.54 Est. | 5,990.05 | –0– | –0– |
| Totals | 150,207.48 | 169,363.08 | 32,145.42 | 35,839.38 | 51,054.83 | 56,801.94 | 18,894 | 18,894 |

A study of Chart C shows totals for the Pacific states would be as follows (in tons): Crown 150,207.48, St. Helens 32,-145.42, Longview 51,054.83, and St. Regis 18,894. We note again that some amounts beyond these figures would represent sales by the minor producers mentioned above, but for the reasons indicated we disregard them for the time being as representing no quantity that would be substantially significant.

With respect to the question of the quantity of sales of the relevant products made in the Pacific coast states from mills in other parts of the country, the record is most unsatisfactory and quite fragmentary, but apparently it is necessarily so. We think, however, that for the purposes of this opinion we can arrive at a figure which is a maximum overall figure for these so-called imports.

The record contains a railway waybill analysis made by the Interstate Commerce Commission designed to show the quantities of shipments into this area of two of these products, namely, wrapping paper and bags, and the sources from which those products were shipped. The waybills examined cover a period of five years, from 1949 to 1953, inclusive. The analysis was a sampling one only, in that but one percent of the waybills of this character were examined and analyzed. That analysis disclosed that if the samples were fairly representative of the total, then during this five year period 89.1 percent of all shipments of wrapping paper to the Pacific coast states and 88 percent of all shipments of bags to the Pacific coast states originated with the Pacific coast mills; 10.9 percent of the wrapping paper shipments, and 12 percent of the bags, came from other sources.[18]

Of course these figures were taken from rail shipments only; they do not include shipments by water, nor do they include shipments by truck. Because the outside mills are located mostly in the eastern and southern states it is not probable that the shipments from these sources, which we shall call "imports" were transported to any considerable extent by truck. On the other hand, more

18. The Commission shows that the projected totals, tonnage-wise, from these samples are probably too high. For example, the totals for wrapping paper shipments from western mills were actually one and one-half times the total production of those mills. Such an error would not necessarily affect the percentages shown, however.

than offsetting any shipments of imports by water, is the fact that 50 percent of St. Helens' shipments were by truck and therefore not included in the waybill analysis. In addition to this fact, both Crown and Longview made substantial shipments by truck throughout the coast states.

As noted, this sampling related only to the shipments of wrapping paper and paper bags. There is some evidence that a few of these importers specialized in bags. Thus Hudson Paper Company, one of the largest, shipped far more bags than wrapping paper. But if it be assumed that the percentages for wrapping paper, approximately 11 percent, would be fairly representative of the percentages of other of these coarse papers, then we might have an indication that 11 percent of all the relevant paper products sold in the Pacific coast states were from imports.[19]

A substantial number of witnesses whom the Commissioner had the right to believe and who were apparently qualified to testify on the matter, did testify that there were not substantial amounts of these relevant paper products imported into the Pacific states during the period here in question. According to their testimony the only firms which in any significant way competed in these products in the Pacific coast states were International Paper Co. and Hudson Pulp and Paper Corp. There was testimony that only International and Hudson shipped kraft paper to the coast. These witnesses explained the reason for this limited competition from outside the area as being due to freight disadvantages in the long haul of these imports. The Commission found that the Western paper mills sold paper F.O.B. mill and absorbed the freight, which of course varied with the distance shipped. Witnesses doing business in the Pacific coast states and buying paper testified that they were deterred from purchasing paper in the East by these higher freight costs. Witnesses also testified to other disadvantages in purchasing paper from the East; one was the time factor required in obtaining deliveries. There was testimony that even if the Pacific coast jobber warehoused his supplies from the East he was still at a disadvantage because when he ran out of some size or type of paper on which quick delivery to a customer was required, there was delay in getting delivery from Gulf or Eastern mills, whereas St. Helens could make delivery much more quickly, and so could the other Pacific coast suppliers. There was testimony that the Pacific coast paper jobber was at a disadvantage unless he could obtain a dependable source which provided a complete line of product papers, and the witnesses had difficulty in obtaining that sort of thing from Eastern or Southern mills.

19. There is another basis for a further estimate of which Crown could make use although it has not undertaken to do so. Later in this opinion we shall have occasion to refer to a survey report made by the Commission; at that point we will indicate our agreement with Crown that it should not have been received in evidence. Nevertheless, since it was a report prepared by the Commission it would seem that Crown would have been at liberty to use information contained therein as an admission by the Commission itself. If that survey were used in that manner, then its figures might constitute an admission by the Commission as to the purchases of imported products within the market here discussed. Those conducting that survey obtained answers to a questionnaire from some 403 firms in the Pacific Coast states, representing 49.1 percent of the distributors, wholesale grocers and converters in that area. These answers show the products purchased and the source of the purchases over a period of 18 months from January 1, 1952 to June 30, 1953. The figures contained in the answers included purchases of Census coarse paper and manufactured bags. They are summarized in Table (11) of the report. The purchases (in dollars) by these firms from Pacific coast mills aggregated $45,840,200, while those from other suppliers amounted to $3,146,929; that is to say, 6.4 percent of the total came from imports.

Crown might have made use of this figure to controvert the Commission's contention that amounts imported were not significant. But it did not do so, and for reasons explained later, we make no use of it.

With respect to International and Hudson, the evidence was more specific. The sales agent for Hudson estimated that it sold in this area in 1952 approximately 7,000 tons of bags but only approximately 500 tons of wrapping paper. In that year International sold no wrapping paper in the area. Hudson's shipments were by water.

Mr. Ticoulat, vice-president of Crown, listed some non-Western firms which he stated had sold paper in these categories on the Pacific coast. His testimony is so uncertain and unsatisfactory that it is devoid of useful information.

The Commission found that "sales of paper included in this proceeding in the 11 Western states from producers outside of this area were relatively insignificant." This followed a similar finding by the Examiner. We are not sure what is meant by the word "relatively" in that finding. For our purposes, and only to make up the chart which we shall presently include in this opinion, we shall make an estimate based in part upon the 11 percent figure produced by the waybill analysis. The other figures on this chart as to sales by other producers furnish a basis upon which we can compute that 11 percent. This would give us a figure for imports of 32,000 tons. Since this amount is not vital or controlling in our decision, we shall go one step further and make this estimated amount 33,000 tons. As above noted, Crown claims that the amounts of paper sold by producers outside this area "exceeded the sales of St. Helens." We are assuming for the purpose of the chart mentioned, therefore, this 33,000 ton figure. This, it will be noted by comparison with Chart C, supra, exceeds the sales of St. Helens. Actually there is nothing in the record to support so high a figure.

To complete our promised chart we must make one further estimate which is as to the total amount of sales of the relevant products in the Pacific coast states by the lesser producing firms, that is to say, by firms other than Crown, St.

Helens, Longview and St. Regis. The ten mills producing some of these papers have been listed previously. Of the six lesser producers Columbia River was the largest. Its total production was 14,700 tons. As the previous table shows, the production of the other companies drops off rapidly. The sales of these concerns from Columbia River down, in 1952, cannot be accurately ascertained from the record. For instance, an officer of Columbia River testified that the 537 tons of wrapping paper included in its total for 1952 were mostly screenings dumped on the market as carliners and not sold as wrapping paper. Some of its vegetable parchment included in other converting paper was sold in the Imperial Valley of California. Some of its product was exported. Publishers, the next in line, was mostly a newsprint producer selling a comparatively small amount of wrapping paper. The others produced minimal quantities. The total production of all these six lesser producing concerns aggregated 23,900 tons of Census coarse paper. We think it would be a fair estimate to say that half of this or 11,950 tons was sold in the Pacific coast states, and this estimate we carry forward to the forthcoming chart.

We are now prepared to disclose on the chart the statistics for 1952 sales in the Pacific coast states from all competing sources. These are arrived at in the manner previously described.

"Chart D

1952 Sales of Census Coarse Papers, plus Manufactured Bags in Three Pacific Coast States, in Tons.

| Company | Tons | Percent of Total |
|---|---|---|
| Crown | 150,207 | 50.53 |
| St. Helens | 32,145 | 10.81 |
| Longview | 51,054 | 17.17 |
| St. Regis | 18,894 | 6.35 |
| Other Western Producers | 11,950 | 4.02 |
| Imports from East and South | 33,000 | 11.10 |
| Total | 297,250 | 99.98" |

· ˙While this chart shows the already dominant position of Crown prior to the merger, and also shows, percentage-wise, a substantial share of the market in St. Helens, it does not alone tell the whole story. The apparently larger share of Longview must be understood in the light of that company's policy of closed outlets. As noted hereafter, so far as paper jobbers were concerned, Longview limited its sales to one single jobber, Blake, Moffit & Towne, which operated throughout the three Pacific states, as well as Arizona, Nevada and parts of Idaho and Montana. Eighty-five percent of all Longview's paper sold to jobbers went to this firm. The remaining 15 percent was confined to two other jobbers who operated in the Intermountain and Rocky Mountain area, and outside of Blake, Moffit & Towne's district. This meant that so far as independent jobbers were concerned, Longview was not a source of supply. The record shows that one of the most important groups of buyers of these papers were these jobbers. Their number in this area is not precisely given, but it approached 300. There were "some hundred" paper jobbers at Los Angeles alone.

Later we shall have occasion to comment upon some of the other results of the merger on these jobbers; but in viewing Chart D, we must bear in mind that while Longview's product was generally unavailable to them, St. Helens produced a broad line of all these relevant papers, and was an available source of all of them for these jobbers.[20]

▆▆▆▆ Congress by the use of the words "may be" made it plain that the purpose of the amended statute was to arrest restraints of trade "in their incipiency and before they developed full fledged restraints violative of the Sherman Act." This is further made plain in the legislative history of the enactment where these words are carefully explained. And to accomplish this end it is plain that Congress had to see to it that no dominant operator in any industry should be permitted to frustrate the purposes of the Act by absorbing its rivals bit by bit. Thus the Senate Report noted that acquisitions which substantially lessened competition would be unlawful if they had the specific effect in any line of commerce "whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition." In other words, a substantial lessening of competition was to be prohibited whether the acquiring corporation accomplished these results by one immense gobble of another large producer or whether it set out to produce the same results by nibbling away at small producers. The Senate Report could not have made this plainer than it did when it defined the problem to which the bill was addressed by quotation of a report of the Federal Trade Commission as follows:

"Under the Sherman Act, an acquisition is unlawful if it creates a monopoly or constitutes an attempt to monopolize. Imminent monopoly may appear when one large concern acquires another, but it is unlikely to be perceived in a small acquisition by a large enterprise. As a large concern grows through a series of such small acquisitions, its accretions of power are individually so minute as to make it difficult to use the Sherman Act test against them * * *

"Where several large enterprises are extending there [sic] power by successive small acquisitions, the cumulative effect of their purchases may be to convert an industry from one of intense competition among many enterprises to one in which three or four large concerns produce the entire supply. This latter pattern (which economists call oligopoly) is likely to be characterized by avoidance of price competition and by respect on the part of each concern for the vested interest of its rival * * * *" (Senate Report No.

20. In contrast note the facts as to St. Regis; as shown on Chart C, its sales of these coarse papers were small with the exception of shipping sack papers.

1775, June 2, 1950, Vol. 2 U.S.Code Cong.Serv. 81st Cong., 2nd Sess., 1950, p. 4297.)

■ It is most important that we understand just what must be proven in order to warrant the Commission's finding that "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." As we have previously indicated, the key words here quoted are *"may be"*; in other words, we are dealing with a question of the reasonably probable results of the merger so far as competition in the market is concerned. As stated in United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 607, 77 S.Ct. 872, 884, 1 L.Ed.2d 1057 " * * * the test of a violation of § 7 is whether, at the time of suit, there is a *reasonable probability* that the acquisition is likely to result in the condemned restraints." (Emphasis added) As the Court stated, the question was whether there was "likelihood" of such result.

In American Crystal Sugar Co. v. Cuban-American Sugar Co., 2 Cir., 259 F.2d 524, 529, the court was affirming a decision in which the district court "made findings bearing on the effect which a merger or a common control of the two companies involved would probably have on competition in that line in that market." [21]

When we recall that we are dealing with the question of what is likely to be the result and whether or not there is a reasonable probability of a substantial lessening of competition, some other considerations become important and relevant. As previously suggested, much of the Government's evidence with respect to various paper companies had to do with the volume of their production. As we have noted, Crown took strong exception to the Government's approach on the basis of production statistics, arguing that the significant question was the volume and place of sales rather than production. Up to this point we have endeavored to ascertain the relevant market both productwise and with respect to the area of the market on the basis of sales of the various competing companies; and as we have indicated, in that connection statistics of sales are more significant than statistics of production.

However, there is one point which the Commission has made in connection with its production statistics which is not without significance when we come to consider the present problem of reasonable probability and reasonable likelihood of a resultant lessening of competition. It seems to us to be manifest that if the merger here in question materially tends to limit the total productive capacity of the companies remaining in the business as competitors of the absorbing company, that would have a substantial bearing upon the question of likelihood of a lessening of competition or tendency to monopoly.

The Commission noted with respect to each product here involved just what the merger did to production capacity in the relevant area. Thus it is disclosed that in 1952, before the merger, Crown's production of wrapping paper was 57.2 percent of the total tonnage of all companies producing that paper in the West; at the same time St. Helens' production was 21.3 percent. In 1954, after the merger, Crown, with St. Helens now a part of it, had 77.6 percent of the total production for that year while all other companies in the area had a total of 22.4 percent. Such a predominance of production would appear not only to be a threat to possible competition but to approach a monopoly situation.

21. Note the language of Judge Weinfeld in United States v. Bethlehem Steel Corporation, supra, 168 F.Supp. at page 603: "The Government is not required to establish with certitude that competition in fact will be substantially lessened. Its burden is met if it establishes a reasonable probability that the proposed merger will substantially lessen competition or tend to create a monopoly. 'A requirement of certainty and actuality of injury to competition is incompatible with an effort to supplement the Sherman Act by reaching incipient restraints.'"

A substantially similar situation resulted with respect to bag paper. Indeed, by 1954, aside from a minimal production by other companies, Crown's production of 78.9 percent and Longview's production of 17.1 percent made it substantially a two company industry in that field. The record shows that, in respect to shipping sack paper, whereas other companies including St. Helens produced substantial quantities in 1952, by 1954 the shipping sack paper industry had become a three company affair. The same thing resulted in respect to envelope paper. In 1952 Crown produced almost 89 percent of waxing paper, St. Helens 5.7 percent, and four other companies less than 2 percent each. In short, even before the merger Crown was most decisively dominant, and the merger made it even more so.

The particular significance of the figures as to production capacities of various companies in the relevant area is that although those production figures are not statistics as to actual sales, yet plainly a company that has no production or very limited production cannot be said to be a potential seller of size.[22]

The test as to whether the merger produced a "reasonable probability" that it would lessen competition or tend toward monopoly is not an easy one to apply because obviously it involves in a degree the forecasting of the future. The wording of the statute and its legislative history demonstrate that not every merger was intended to be prohibited; in fact, in drafting the amended statute in 1950, Congress made some changes designed to prevent any such conclusion.[23]

22. With respect to bag paper for instance the production figures for 1952 were as follows:

| "Company | Tonnage | Per Cent of Total Production |
|---|---|---|
| Crown | 77,485 | 68.3 |
| Longview | 21,782 | 19.2 |
| St. Helens | 10,834 | 9.6 |
| St. Regis | 3,270 | 2.9 |
| Potlatch | 9 | * |
| * Less than one-tenth of 1 per cent of total production" | 113,380 | 100.0 |

After the merger in 1954 the production figures were as follows:

| "Company | Tonnage | Per Cent of Total Production |
|---|---|---|
| Crown (including St. Helens) | 100,854 | 78.9 |
| Longview | 21,894 | 17.1 |
| St. Regis | 4,144 | 3.2 |
| Potlatch | 713 | 0.6 |
| Weyerhaeuser | 304 | 0.2 |
| Simpson | 22 | * |
| | 127,931 | 100.0 |

* Less than one-tenth of one per cent."
It is on the basis of such production statistics that the Commission asserts that the bag paper production had become for all practical purposes a two company industry.

23. From the Senate Report: "While on the one hand it was desired that the test be more inclusive and stricter than that of the Sherman Act, on the other hand it was not desired that the bill go to the extreme of prohibiting all acquisitions between competing companies."

A mere possibility of a lessening of competition would not suffice; on the other hand, actual proof of injury to or restraint of competition was not contemplated because the enactment was designed to go beyond the Sherman Act's requirements of such proof and to furnish remedies more readily available.[24]

As was noted in United States v. E. I. du Pont de Nemours & Co., 353 U.S. at page 607, 77 S.Ct. at page 884, often the participants in a merger take such action with the best of motives and with no thought or intention of restraint of trade or monopoly. The Court there said: "It is not requisite to the proof of a violation of § 7 to show that restraint or monopoly was intended." In the instant case, Crown may have seen in the acquisition of St. Helens an opportunity to provide itself with a more efficient, more useful set of production facilities. Thus St. Helens was developing a new bleaching plant. Acquiring that plant could save Crown from building a similar plant elsewhere. When a large company increases its size, it has an opportunity to lower its costs of operation; it may by acquiring plants near certain markets save transportation costs. As a concern grows it may accomplish other economies: in purchases, in setting up research and legal staffs, and in increasing its advertising and promotion budgets. Such growth may well result in enabling it to offer its goods at lower prices. That might well be a positive benefit to ultimate consumers.

It is plain however from the Act and its legislative history that concern with such considerations was no part of the Congressional thought. Congress was not concerned about increased efficiency; it was concerned about the competitor,— the small business man whose "little, independent units are gobbled up by bigger ones,"[25] and about other competitors whose opportunities to meet the prices of the larger concern and hence compete with it might be diminished by a merger which increased the concentration of power in the large organization. Thus the House Report described as one of the unlawful effects which the legislation was designed to avoid an "increase in the relative size of the enterprise making the acquisition to such a point that its advantage over its competitors threatens to be decisive. * * *" H.R.Rep. No. 1191, 81st Cong., First Sess. p. 8, (1949). As stated in the Senate Report, cited above, the purpose of the legislation was "to limit future increases in the level of economic concentration resulting from corporate mergers and acquisitions."

As the legislation was under consideration by Congress it was duly appreciated that decentralized and deconcentrated markets are often uneconomic and provide higher costs and prices.[26] All this it laid aside in its concern over the "curse of bigness" and the concentration of power in the nation's markets which Congress thought advantaged the big man and disadvantaged the little one.[27]

24. "[T]he bill, if enacted, would not apply to the mere possibility but only to the reasonable probability of the prescribed effect * * *. A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints."

25. The quoted language is from the dissent of Mr. Justice Douglas in United States v. Columbia Steel Co., supra [351 U.S. 377, 68 S.Ct. 1127]. Obviously it was the majority decision in that case which § 7 was designed to avoid.

26. United States v. Bethlehem Steel Corp., supra, 168 F.Supp. at page 617: "In ap-

proving the policy embodied in these acts, Congress rejected the alleged advantages of size in favor of the preservation of a competitive system." See remarks in the course of debate in the House, 95 Cong.Rec. pp. 11,486 and 11,496 (1949). This was a choice similar to that in recent agricultural adjustment programs whereby in order to preserve the status of the small family size farm as against the more efficient, large mechanized one, Congress authorized price supports producing higher costs for the consumer.

27. Of course, this economic choice by Congress has been challenged. See Lilienthal, "Big Business: A New Era". But

Anyone attempting to formulate the tests to be applied in determining whether a given merger is one whose effect "may be substantially to lessen competition, or to tend to create a monopoly" should begin with a reading of the House and Senate reports that accompanied the bill which brought about the amended section.[28] Thus the House Report contained an extensive discussion of the evils of business concentration. It noted 445 corporations owned 51 percent of the country's gross assets. In many great industries three or four firms controlled most of the business. Thus concentration was still increasing, and much of this was through mergers. Small industries, small businesses, were rapidly being wiped out by mergers through which they were being absorbed by big firms. Those in charge of the bill considered that "these mergers are usually the forerunners of collectivism and socialism",[29] and noted the lessons from other countries where opportunity had been vested in the hands of a few: "The result has been that either socialization or a totalitarian form of government has taken over." [30]

The most certain thing about the case before us is that its facts, in a striking manner, disclose exactly the sort of thing which the Congressional Reports said should be prohibited. This sort of merger was precisely the kind which was portrayed as an evil to be avoided. In considering, then, the meaning of those words, phrased with such generality and lack of concrete specification: "may be substantially to lessen competition, or to tend to create a monopoly", we must assume that this strongly stated purpose of the Reports throws much light upon the meaning of the statutory phraseology. It would be strange indeed if it were to be held that the words of the amended section had no impact whatever upon a typical instance of the evils sought to be cured.

Much has been written concerning the appropriate tests to be applied in enforcing § 7. On the one hand the comparatively simple standard based on the merged company's percentage of the market has been suggested,—the rationale applied in Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, where there was involved the exclusive supply contract prohibitions of § 3 of the Clayton Act, 15 U.S.C.A. § 14. Although § 3 used the same language as does § 7 in referring to the lessening of competition and the tendency to monopoly, yet persuasive reasons have been given as to why this so-called "quantitative substantiality" test is not properly applied in a § 7 case.[31]

On the other hand some writers have suggested that the Commission, or the courts, in inquiring into a claimed violation of § 7 should examine a multitude of so-called relevant economic factors.[32]

as stated in the Standard Stations case, 337 U.S. 293, 312, 69 S.Ct. 1051, 1061, 93 L.Ed. 1371, this is an issue "that has not been submitted to our decision".

28. H.R.Rep. No. 1191, 81st Cong., 1st Sess., (1949); S.Rep. No. 1775, 81st Cong., 2nd Sess.

29. Congressman Celler, at 95 Cong.Rec. 11,486 (1949).

30. Senator Aiken at 96 Cong.Rec. 16,503–4 (1950).

31. See Transamerica Corp. v. Board of Governors, 3 Cir., 206 F.2d 163, 170. "From this decision has come the 'quantitative substantiality doctrine,' a bit of jargon serving as a badge of membership in the antitrust fraternity, or perhaps —like Durrell's Justine—as a wearisome turnstile through which we all must presumably pass. Transplanted into section 7, the quantitative substantiality doctrine would seemingly imply that any horizontal merger could be struck down on a showing, without more, that the acquired firm sold a substantial share—perhaps some six to seven percent—of the goods in the relevant market." Bok, "Section 7 of the Clayton Act and the Merging of Law and Economics," 74 Harv.L.Rev. 226, at p. 250 (Dec. 1960).

32. "Product, geographic, and functional markets identified, it may then become relevant to examine questions like:
"(a) What companies buy or sell in the market, how many, and what are the sig-

As if the average anti-trust trial were not sufficiently complicated at best, some of these suggestions to enlarge the list of "relevant factors" upon which findings were required would tend to make a case of this kind so appallingly complicated that any judge might well wonder whether the controversy was really a justiciable one.[33] And it is a bit hard to believe that Congress meant that a business concern contemplating merger must undergo a similar struggle to find out whether its plans may or may not be carried out.

Fortunately we are not called upon here to frame any standards for testing the application of § 7 to all possible mergers. Possibly more complicated tests and more extensive economic surveys may be required in some close cases. But we have only this case to decide; and on its facts it is not a close one.

Crown, with its leadership in production and sales of the product-line papers, its great disparity in size as compared with other competitors in the area, and its position as a price leader in the market, was already in a dominant position before the merger. Its acquisition of St. Helens could not help but substantially increase that dominance. It significantly added to its concentration of power.

To borrow a phrase from Universal Camera,[34] Congress expressed a mood that acquisition of a rival firm by a larger one, resulting in a substantial increase in the concentration of power in the absorbing concern, is to be prohibited for the reason that such increased opportunity for domination will probably lessen competition or tend to create a monopoly. It is its tendency to concentration of power that condemns this merger.

nificant differences among them: (i) large, medium, and small (market shares, or rank of large companies, etc.); (ii) degrees of vertical integration; (iii) uses of the product; and (iv) the significance of the product under study in the output or in the purchases of different companies;

["b" is missing]

"(c) What methods of sales are used in the market: (i) how are the prices of different sellers related; what of price history; (ii) how free are buyers or sellers to seek new suppliers or outlets; what determines whether changes will be made?

"(d) What are the opportunities for entry of new companies or for expansion of existing companies into particular product or geographic markets?

"(e) What are the opportunities for innovation in products, in techniques, in methods of sales, etc.?

"(f) What types of natural limitations on resources, economies of scale, or special national policies modify the conditions under which companies compete?

"(g) What is the long-run supply and demand picture and how does it influence the character of competition?

"All of such facts cannot and need not be investigated in each case; only those relevant in particular market contexts, and obtainable at reasonable cost, should become a part of the record."

(Report of the Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955, p. 126.)

We are left in the dark as to what we should do with the answers to all these questions once we have them; what answers would prove the merger good,—what ones prove it bad?

33. This sort of difficulty was suggested in Standard Oil Co. v. United States, 337 U.S. 293, 310, 69 S.Ct. 1051, 1060, 93 L. Ed. 1371, where the court alluded to a "standard of proof if not virtually impossible to meet, at least most ill-suited for ascertainment by courts," adding in a footnote (337 U.S. at page 310, footnote 13, 69 S.Ct. at page 1060): "The dual system of enforcement provided for by the Clayton Act must have contemplated standards of proof capable of administration by the courts as well as by the Federal Trade Commission and other designated agencies. See 38 Stat. 734, 736, as amended, 15 U.S.C. §§ 21, 25, 15 U.S. C.A. §§ 21, 25. Our interpretation of the Act, therefore, should recognize that an appraisal of economic data which might be practicable if only the latter were faced with the task may be quite otherwise for judges unequipped for it either by experience or by the availability of skilled assistance."

34. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 487, 71 S.Ct. 456, 95 L.Ed. 456.

■ This alone justified the Commission's finding that the reasonably probable result of the acquisition would be substantially to lessen competition and to tend to create a monopoly.

The record also contains evidence designed to show the practical effects of St. Helens being eliminated as a competitor in this market. St. Helens had a favorable market for its papers with independent paper jobbers. It had a similar market with independent converters. In 1952 Crown and St. Helens were substantially the only sources for sulphate wrapping paper available to independent jobbers. This was because of Longview's exclusive jobber arrangement, mentioned above, because St. Regis then sold none of its small tonnage to jobbers, because Publishers produced only sulphite papers of inferior strength, and because Inland Empire's and Columbia River's wrapping paper was sold only as screenings. St. Helens, differing from Crown, did not compete with its jobber customers. Crown had its wholly owned paper distributor, Zellerbach Paper Company, which competed with the same jobber buyers. Once St. Helens was eliminated,

it was testified by some jobber witnesses, their only source for such paper was Crown. This put them, they testified, at a competitive disadvantage.[35] The Commission concluded that this was so.

The Commission regarded the evidence here referred to as proof that in consequence of the merger there had actually been an adverse effect upon competition. The theory of the Commission was that St. Helens had been a firm which had made a useful contribution to competition in the market. Because it did not itself act as a jobber but sold generally to independent jobbers, and because it was not generally a converter aside from paper bags, both converters and jobbers found St. Helens a useful source for their supply of papers of the kinds here involved.

St. Helens' usefulness, the theory goes, was based upon its availability as a dependable source of supply of a wide range of these papers. Because, as we have noted, few producers in the area supplied such a broad line, and because of the finding of the Commission that suppliers outside the West were generally unreliable sources, particularly in view

35. Thus the President of Union Paper Company of California, a paper jobber handling coarse papers, including wrapping papers, testified that prior to the merger he bought a considerable amount of these coarse paper products from the St. Helens mill through Graham Paper Co. which handled them. He explained the advantages of being able to purchase such paper from more than one mill; for example, competitively, one or the other might give more speedy delivery. After the merger he had to buy his wrapping paper from Crown. As a matter of economics, due to freight rates, shipping time, etc., he could not buy from eastern mills; but in buying from Crown he had what he called a disadvantage in selling or reselling paper because the paper he purchased was labeled "a product of the Crown Zellerbach Corporation". This included the name "Zellerbach" which suggested the name of his competitor, Zellerbach Paper Company.

A paper jobber in Portland who dealt in coarse paper also bought from St. Helens prior to the merger as well as from Crown and others. He had not pur-

chased from eastern companies because they did not offer a complete line. He explained the importance to his business of a continuous source of supply in such a complete line. Since the merger he had to buy from Crown although he would have preferred to have alternate sources of supplies. "We feel that a competitive situation improves our service and we found that to be the case." He regarded it as a disadvantage to have to buy from a competitor. He found that since his St. Helens source was lost, it had been difficult to get from Crown the information and assistance which had formerly been available to him from St. Helens.

Another witness testified that after he was unable as formerly to sell his customers paper from St. Helens, his customers were dissatisfied, thinking that they were buying through a middleman and that they had better buy from Zellerbach Paper Company for they knew they were getting Crown Zellerbach Paper. He testified that he felt that because of the confusion in his clients' minds he had lost business.

of the recurrent paper shortages, the Commission held: "Clearly, with the elimination of St. Helens, Western jobbers generally have been severely restricted as to sources from which the relevant papers may be purchased. It likewise appears that many converters which formerly could look to St. Helens for purchases of the relevant papers must now depend upon Crown as a primary source of supply, a company which is a major competitor since Crown converts a substantial share of its production." The consequence of this, the Commission stated, was that Crown's position was enhanced by the merger, because by means of its jobber division, Zellerbach Paper Company, "It is now competing with many more jobbers for which it has become a major supplier." [36]

There were other respects in which the Commission asserts the merger operated to the disadvantage of paper jobbers and had harmful effects upon their previously existing competitive opportunities. Thus the proprietor of a substantial paper business in San Francisco testified that prior to the merger his principal source of supply of coarse paper had been St. Helens. He had customers then in Los Angeles, Portland, Seattle and other areas. While St. Helens was operating he was able to supply those customers through deliveries made directly from the St. Helens' mill to them. Furthermore, at that time he was able to procure many shipments to those customers by truck and to make deliveries within 60 hours after orders. After St. Helens had vanished and had been taken over, Crown refused to give him that service because of its policy not to ship out of his trading area of San Francisco and vicinity. The only way in which he could supply his old customers outside of San Francisco was to make shipments from his warehouse, which was more costly to him.

The same thing happened with respect to his attempted sales in Portland. There, though the deliveries were only two miles from Crown's mill, he had to pay a penalty for having deliveries made in Portland. Asked why he did not buy from International or some one else out of the area, he testified that the time required for delivery and the possibility of running out of some sizes in the interim made purchases from the Gulf ports disadvantageous.

A paper jobber from Los Angeles testified that prior to the merger he bought most of his wrapping paper from St. Helens. Thereafter he bought almost all from Crown. He too testified as to better service, and deliveries directly to his customers from St. Helens, and that Crown refused to make such deliveries. He stated that St. Helens was marked by willingness to cooperate with the independent jobber in matters of that character. Other witnesses testified to the same effect.

Petitioner finds much fault with the conclusions of the Commission with respect to the matters just mentioned. It notes that only a few of the many jobbers in this field testified. It explains the longer period for deliveries on the ground that the witnesses must have been referring to a period of paper shortage. It asserts that St. Helens had exactly the same policy with respect to not making deliveries for jobbers outside their market area where the jobbers maintained warehouses. It refers to some of the witnesses who complained of having to buy now from a competitor as being hostile and contends that their testimony was unconvincing.

All that we can say about this is that the Commission's finding with

36. The Examiner concluded: "As a result of the acquisition, these Western jobbers are in the precarious position of being dependent upon a company as a source of supply which was in fact an active competitor and which could suddenly decide that it wished to make all the profit possible in the sale of paper and dispose of its entire production through its own jobbing division. If the respondent should adopt this policy, it would, in effect, put independent jobbers of coarse paper in the eleven Western States out of business."

respect to these disadvantages to jobbers and converters found justification in the record and was supported by evidence which the Commission had the right to accept. Crown argues that only six of the jobber witnesses testified to these adverse effects on jobbers. If those six who testified had these experiences, then, in the absence of contradictory testimony by others, it can be inferred that the conditions described existed generally. We cannot hold the Commission's findings on this point clearly erroneous.[37]

Crown asserts that the Commission's conclusion as to the increased dominance in the market gained by Crown through the merger, and the consequences of any concentration resulting therefrom, are rendered unimportant for the purpose of ascertaining whether the merger will lessen competition or tend to create a monopoly because of the fact that new paper manufacturing companies have entered the paper and paperboard industry in the West since 1949.[38]

It is not altogether clear just how material prospects of new entrants in the market may be in a case of this kind. Perhaps it is doubtful whether a concern like Crown, which has accomplished a merger which under ordinary standards cannot be permitted to stand,

can avoid the consequences by saying: "Although we have effected a merger which in the ordinary course would have the prohibited results, yet we cannot be required to undo this merger because the prospective entrance into the market of new competitors will serve to offset the consequences of the merger." [39]

■■■ We find it unnecessary to pursue that point, however, for the Commission found against this contention of Crown, and the finding we think has justification and support in the record.[40]

Crown contends that it was denied a fair hearing before the Commission, primarily because of the receipt in evidence of a 338 page market survey, Exhibit 176. It appears that after the complaint was filed in this case, the Commission directed that a survey be made of the coarse paper industry. This survey was then made through questionnaires mailed by the Commission to jobbers and converters in the eleven Western states seeking responses as to their purchases of paper and paper converted products. Crown complains that this survey was conducted secretly without any opportunity for it to participate or to make suggestions as to information to be sought or as to persons to be queried. Crown had no opportunity to cross-ex-

37. In United States v. Bethlehem Steel Corporation, supra, the Court places some emphasis upon the fact that Youngstown, which produced rope wire but did not manufacture wire rope, was a desirable source of such wire for an independent wirerope fabricator, and that with the elimination of Youngstown this independent fabricator would have to purchase the rope wire from Bethlehem so that the independent fabricator would thus be having to purchase from a competitor. It has been suggested that this could not be a disadvantage from a competitive standpoint. See Adelman "Economic Aspects of the Bethlehem Opinion,", 45 Va.L.Rev. 684, 694. It would appear to be within the competence of the Commission to consider this to be a competitive disadvantage.

38. The firms here referred to are St. Regis, Weyerhaeuser and Potlatch, listed in the production tables, supra, and Scott Paper Company, Western Kraft Corp.,

and R–W Paper Co. with mills in Washington and Oregon. Georgia Pacific Paper Company is said to have a mill under construction and International Paper Company is said to be planning to build a coarse paper mill in Oregon.

39. "The loss of a substantial firm, however, may of itself induce a reduction in the vigor of competition. For even if new entrants are coming into the market or concentration is for some other reason declining, there will be one less substantial firm than would have existed but for the merger, and an adverse finding under § 7 is predicated on the presumption that competition would have benefited had that firm remained independent." Bok, supra, footnote 31, at 327, note 299.

40. Said the Commission: "Under the circumstances, it does not appear that new entrants will measurably offset the lessening of competition apparent in this record."

amine the persons responding to the inquiries or even to inspect portions of the responses which, because they related to trade secrets, were not made available to anybody connected with the hearing. The hearing examiner sustained the objections to this exhibit and to another exhibit summarizing the replies received, but upon an interlocutory appeal the Commission directed that the basic information and work papers be made available to petitioner and remanded the cause for further proceedings. Subsequently certain corrections and deletions were made in the survey in accordance with the rulings of the hearing examiner and the tabulations of replies was received in evidence. Noting these things the Examiner stated: "In view of the questionable probative value of this economic survey, no consideration has been given it in making this decision." Notwithstanding the Commission itself had required the Examiner to admit this exhibit, the Commission in its final opinion appears to have had doubts as to its propriety or its value, and, while declining to strike the exhibit from the record, nevertheless stated: "In the initial decision, the hearing examiner gave the survey no consideration because he believed it to be of questionable probative value. Nor have we relied upon it in making our decision."

In the light of this treatment of the questioned exhibit by both the Examiner and the Commission itself, we must conclude that allowing it to remain in the record has been no more than harmless error. We have disregarded it in coming to our conclusions in this case. Possibly some portions of it might have been relied upon by the petitioner as constituting admissions on the part of the Commission. Even that does not appear to have been attempted.

Relying upon the rule stated in International Shoe Co. v. F. T. C., 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431, petitioner asserts that at the time of its acquisition St. Helens was in a failing or near bankrupt condition and hence that the acquisition was not prohibited. In support of this contention petitioner asserts that St. Helens' management had been poor and inadequate; that it had obsolete equipment which it could not replace; and that its prospects for survival seemed dim.

The evidence shows that for several years prior to the acquisition of St. Helens, it was in the process of rehabilitating, retooling, and rebuilding its mill pursuant to a modernization program. It had some difficulties in financing this program, and as it proceeded changes and reforms were made which resulted in constantly increasing estimates of costs. Throughout this period St. Helens continued production as previously. One of the improvements undertaken was the installation of a bleaching plant furnishing facilities previously unavailable to St. Helens. This portion of the rehabilitation program had been completed before the take-over. The improvement program, first estimated to cost 5 million dollars, as later revised was then estimated to require $8,875,000; still later it appeared that $9,300,000 would be necessary. Arrangements for financing to meet these increased costs had not been completed by August, 1952, when the president of St. Helens died unexpectedly. The directors of St. Helens started negotiations with Olin Industries with a view to selling. The latter did not buy. Thereafter the St. Helens property was offered to and taken by Crown, thus accomplishing the merger here under attack.

It is plain that the circumstances thus relied upon by petitioner demonstrate that operating a paper mill, keeping it up to date, and financing required improvements and rehabilitation is not an easy task. The circumstances would permit a finding that the directors wanted to quit; but the record does not compel a finding that St. Helens was in a failing or near bankrupt condition. Quite the contrary. The finding of the Commission was as follows: "As of December 31, 1952, St. Helens' total assets were $15,223,754, and its net worth was $9,436,441. St. Helens' annual net sales in the 10 year period between January 1, 1943, and December 31, 1952, increased

from $5,435,053 to $9,258,508. Its annual net income during the same period increased from $357,754 to $638,534, the latter amount not including proceeds from insurance on the life of the company's late president or credit in connection with the excess profits tax. From 1943 to 1952 St. Helens' earnings per share of common stock ranged from a low of $.66 in 1945 to a high of $3.56 in 1948, with earnings of $2.73 in 1952, which earnings apparently are based on net profits, including the aforementioned excess profits tax refund and the proceeds from the life insurance policy. Beginning in 1929, St. Helens paid dividends in every year except 1932. There are no facts in this record to clearly indicate that St. Helens would have been unable to complete its modernization program. We are of the opinion that St. Helens had been and was at the time of the acquisition an effective competitor, and that there is no sufficient reason to believe that it was in a failing or bankrupt condition." The record sustains that finding and that disposes of this attempted defense by the petitioner.

■■■ This brings us to a final inquiry as to what consequences follow from the fact that the views we have expressed here as to the relevant market differ from those of the Commission. As noted, in our opinion in addition to the several coarse paper items treated by the Commission as constituting the relevant product, the volume of business done by St. Helens in manufactured bags should require that those be added to the product considered relevant. The findings of the Commission did not take that item into consideration. Adding manufactured bags, as shown by the charts which we have incorporated in this opinion, does not make a major change in the statistical record here; the evidence of increased dominance and concentration which we have noted will bear out the Commission's findings whether paper bags are or are not included in the relevant product market. There is no occasion for new findings of the Commission based upon this comparatively minor alteration in the relevant market.

As for the area of the relevant market, we have noted that in our view the appropriate and relevant geographical area to be considered here comprises the three Pacific coast states. This is a more limited and restricted area than that selected by the Examiner and accepted by the Commission. However, what the Commission actually said upon this point was as follows: "The evidence is likewise sufficient to show that the three Pacific Coast States, California, Oregon and Washington, constitute a section of the country, within the meaning of Section 7, for much the same reasons. This is where the great bulk of the domestic sales, of the papers involved, by Crown and St. Helens were concentrated. For the purpose of this decision, however, the Eleven Western States will be regarded as the appropriate section." [41]

It is possible that in the light of this finding the Commission was saying that in any event whether the geographic dimensions of the market be taken to be the eleven states of the West, or the three states on the Pacific Coast, the acquisition was one which might have the consequence of lessening competition or tending to create a monopoly in either area or in both of them.

41. In United States v. Bethlehem Steel Corporation, supra, 168 F.Supp. at page 603, the court found relevant markets in certain listed products in "(a) the United States as a whole, (b) the northeast quadrant of the United States, (c) Michigan, Ohio, Pennsylvania and New York, (d) Michigan and Ohio, (e) Michigan and (f) Ohio." One rather bitter commentator on that opinion stated: "One may be excused for guessing that this picking and choosing of market definition was done to make the decision proof against reversal—no matter what the Supreme Court chose to call the market, the district court would already have done it, made the appropriate finding, and declared the merger illegal." Adelman, "Economic Aspects of the Bethlehem Opinion," 45 Va.L.Rev. 684, 694.

It is implicit in the whole approach of the petitioner that if the relevant market area is larger there is less likelihood of lessening of competition or of monopolistic tendencies.[42] For this reason petitioner has argued that the relevant market area here should be all states west of the Mississippi. But since the Commission has found that treating the eleven western states as the relevant geographic market, the merger offends the statute, then *a fortiori* it offends the statute if the more limited three Pacific states area is deemed the relevant market. For this reason we find no occasion here to remand for further findings since our views would lead to no different result.

The order of the Commission is affirmed.

### Appendix A

#### Source of Sales Data on Chart "A"

These figures are compiled from Commission Exhibits 36A to Z, all bound in Exhibit Volume IV. It shows purchaser, place of delivery and quantity, in tons, of each sale by Crown of the various paper products. With the exception of shipping sack paper, the chart includes sales to Zellerbach Paper Co. and to Crown's Western Waxed Paper Division and Western Gummed and Coated Products Division. (Crown's brief describes Zellerbach Paper Co. as its "second largest customer" for Census coarse paper.) These are included in order truly to reflect the total market impact and the competitive situation with respect to the product items. Tissue papers listed on the wrapping paper pages are not included on the chart. Waxing and Gumming papers are carried (p. 2316) as a single item, but have been sorted out by us on the chart by identification through the names of purchasers "Other convert-

ing" paper sales charted include foil laminating paper (p. 2311), laminating and oiling papers, (p. 2316), vegetable crate liners (pp. 2317–2318). Shipping sack paper sales are not shown on this exhibit. The figure shown on the chart for shipping sack paper is from Crown's opening brief, p. 33.

#### Comparison With Totals in Briefs of Parties.

When the totals on this chart are checked against the totals asserted by the parties in their briefs, we find that those given in the Commission's brief closely correspond to our calculations. (See right hand column). Crown's claimed totals (fourth line from bottom) do not correspond. This is in part because they omit "other converting" and all sales to Zellerbach Paper Co. and the Western Waxed Paper and Western Gummed and Coated Products Divisions. But even making these adjustments, Crown's totals are too small. This error may be sampled by checking the total Crown gives for sales in Nevada (27 tons) against the figures shown on pages 2281, 2284 and 2291 of these Exhibits. They show a total of sales in Nevada to independents only, exclusive of Zellerbach Paper Co. of 109.40 tons. A similar set of errors does not appear in Crown's totals as to St. Helens on Chart B.

### Appendix B

#### Source of Sales Data on Chart "B"

These figures of St. Helens' 1952 sales were compiled from Commission's Exhibit 117, bound in Exhibit Volumes XVIII and XIX. It reports sales by reference to trade names of paper. Their categories (wrapping paper, bag paper, etc.) were determined from the testimony of witnesses. Place of sales was determined from addresses of buyers.

---

42. Thus Crown argues that the Commission's relevant geographic market was too narrow, "thereby exaggerating the importance of St. Helens and excluding from consideration many of St. Helens' and Crown's competitors."

It also says: "The decision of the Commission depends on its narrowly con- fining the relevant market to 'Census coarse paper' produced in the 11 western states. * * * We may take it as conceded by the Commission that there was no violation of Section 7 if the market is actually a broader one in either its product or geographic dimensions."

The figures in the exhibit are in pounds. These were converted to tons by dividing by 2000, and the figures on Chart "B" are the result. The cross-check with briefs of the parties, as disclosed by the chart, shows a close tally in each case except for "other converting" papers.

### Appendix C

#### Source of Sales Data on Chart "C"

As to Longview: Sales are estimated from production figures on the basis of testimony of the firm's president. Substantially all bag paper was sold on the Atlantic coast. Hence no sales of this item appear on this chart. Shipping sack paper was sold to converters which were in the three coastal states. Longview converted "between 25 and 30 per cent" of its bag paper, waxing paper and asphalting paper. Hence manufactured bag sales were computed at 27.5 percent of production. All were sold in the 11 Western states. Sales of waxing paper were estimated at production less 27.5 percent. Though very limited amounts of wrapping and gumming paper were sold in Texas, substantially all of these products were sold in the 11 states mentioned. Though at the date of this testimony "some" sales were made to converters in South Africa and Trinidad, these are ignored as those sales had not "been a feature of our business very long". It does not appear that they dated back to 1952.

As to St. Regis: All of this firm's production of the relevant papers was at its Tacoma mill. The detailed production of that mill in the coarse paper line is in CX 130A–B, Exhibit IX, pp. 3491–3402. The mill converted 75 percent of its production of shipping sack paper, so sales of that item are only 25 percent of production. It converts none of its bag paper and its sales of that item were mostly to the Los Angeles Bag Company. It sold the 90-lb. cup stock in the East, so that item wasn't included in "other converting", for purposes of this chart. The rest of its coarse paper, including production was sold "primarily on the West Coast"; that seemed to cover the sale of its whole production of wrapping and waxing papers. Its Western production of shipping-sacks was also sold "mainly on the West Coast." From this apparent sales pattern it was estimated that all sales which St. Regis made in the West were made in the three Pacific coast states.

Concerning certain estimated figures in Chart C:—It will be noted that three of the figures in the "Longview Fibre" column, and one in the "Crown-Zellerbach" column are indicated to be estimates, thus: "Est." The reason for this is as follows: The record shows that Longview sold in the eleven western states (which include the Pacific coast states) 16,417 tons of wrapping paper, 587 tons of gumming paper and 5,990.05 tons of manufactured bags. It does not show what portion of these amounts were sold in the three Pacific coast states. We think a reasonable estimate of that portion would be three-fourths of the whole. The inserted estimated amounts are arrived at in that manner. Chart "A" shows why a similar estimate is made as to Crown's Pacific coast states sales of shipping sack paper. This latter figure is an underestimate, since, as Chart "A" shows, it did not include sales to Zellerbach Paper Co. In our view, the final conclusion drawn by us from these charts would not be altered whether we computed the estimated amounts as two-thirds, four-fifths or nine-tenths.

### On Petition for Rehearing.

After Petitioner filed its petition for rehearing the Commission sought and was granted time within which to make reply thereto. We find in the petition no reason why our original opinion should not stand or why a rehearing should be granted. We do find statements which indicate a failure fully to understand the import of our decision, and because of that, we take this occasion to comment upon certain of the contentions made.

The first is that instead of affirming the Commission's order, this court should have set it aside. This is said to be re-

quired by the rule stated in Securities & Exchange Comm. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 458, 87 L.Ed. 626.[1] It is asserted that this court has affirmed the Commission's order on grounds other than those adopted by the Commission,—that we have held that the Commission "erred in its basis for decision." That contention discloses a misunderstanding of the import of our decision.

While our opinion supplied from the record charts of statistics which, in our view, reinforced and supported the Commission's findings, we have in no manner disapproved or rejected the Commission's bases for its decision that "the effect of this acquisition may be substantially to lessen competition or tend to create a monopoly", that at the time of acquisition Crown had "a predominant share of the market", that by the acquisition Crown increased significantly its size in the market "in which it already had a commanding lead", and that the result was the removal from the supplier market of "an important, fully integrated competitor" with "fully developed sales outlet to the trade." Our tabulations assigned to Crown 50.53 per cent of the market, and to St. Helens 10.81 per cent which confirm the substantial accuracy of the Commission's results, taken from production records, of 51.5 per cent and 11 per cent respectively.

It is true, also, that we found the relevant market, area-wise, to be the three Pacific Coast states, but we noted that the Commission, while choosing a wider market, had also found the evidence "sufficient to show that the three Pacific Coast states * * * constitute a section of the country, within the meaning of § 7".[2] We had thought that our decision made clear, particularly in the last four paragraphs of the opinion, that we were but adopting and reenforcing the *ratio decidendi* of the Commission.

Petitioner challenges the statistics used to make up the several charts contained in our opinion. With one exception, which we shall note shortly, we continue to hold that the statistical situation presented in those charts is correct and that petitioner's attempted alterations thereof are wrong and without basis in the record.

This challenge of our charts is in any event without any real significance for even after petitioner's attempt to revise our Chart D, it still comes up with a figure showing Crown to have had 35.5 per cent of the total market; and whether Crown's share was 50.53 per cent, as our Chart D showed it to be, or 35.5 per cent as per petitioner's revision of the Chart D, the conclusion reached by us is not altered. We said "Crown, with its leadership in production and sales of the product-line papers, its great dispar-

1. In Chenery the Court noted that in reaching the order there under review the Commission stated that it "was merely applying 'the broad equitable principles enunciated in the cases heretofore cited.'" The Court held: "The cases upon which the Commission relied do not establish principles of law and equity which in themselves are sufficient to sustain its order." The Court explained its decision when the case came up for the second time, (Securities & Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995), saying: "When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determina-

tion or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency."

2. While adding manufactured bags to our product market we stated: "We cannot say that the product market here, whether it includes or excludes manufactured bags, did not meet that test."

ity in size as compared with other competitors in the area, and its position as a price leader in the market, was already in a dominant position before the merger. Its acquisition of St. Helens could not help but substantially increase that dominance. It significantly added to its concentration of power." Even if we were to accept petitioner's revised figures, we would be obliged to say the same thing and to reach the further conclusion that the acquisition would probably result in a substantial lessening of competition and tend to create a monopoly.

After a careful examination of the computations now brought forward in the petition for rehearing, we are of the opinion, previously expressed, that the statistics of sales furnished in our charts are substantially correct.[3]

We do note one alteration which should have been included in Chart D. There should have been a reference to the Los Angeles Paper Bag Co. and its production of bags. Petitioner makes a calculation from which it concludes that sales of 15,703 tons of manufactured bags should have been added to the totals of the relevant product sold in this market. We doubt if this company's sales were so high. But if we were to modify Chart D by including that amount as sales of manufactured bags, our Chart D would show Crown's percentage of the total to be 47.99 per cent and St. Helen's percentage to be 10 per cent. The ultimate result is no different.[4]

The fact is that no combination of figures of production or sales found in this record can possibly modify or alter the basic findings of the Commission and of this court that prior to the merger Crown's position in the market was a dominant one; and that after it had absorbed St. Helens, which was practically the only real and substantial producer in

---

3. To illustrate the approach which petitioner makes with respect to these sales statistics we refer to petitioner's discussion of its manufactured bags. Petitioner says the figure shown in our Chart C should be "not more than 37,978 tons" rather than the 46,073 tons disclosed in the chart. The latter figure is compiled from Chart A. This assertion by Crown is evidently based upon its application of a stated percentage of an item of 54,910 tons of *bag paper* listed in a tabulation in the Commission's brief under the heading: "Unsold or Consumed Production". As disclosed in our Appendix A, the sales data in Chart A were compiled from Exhibits 36A to Z; Crown's bag sales in 1952 in the three Pacific Coast states appear on various pages from 2353 to 2378 of Exhibit Vol. 4. The totals shown Chart A are taken from that source and computed with the aid of an adding machine.

Another calculation which we find ourselves unable to accept is petitioner's bringing forward of what is plainly a highly inflated calculation of the amounts of product-line papers sold in the Pacific Coast states from non-western mills. We find in the petition for rehearing nothing whatever to alter our view expressed in the opinion that there is nothing in the record to support so high a figure as the 33,000 tons amount which we inserted in our Chart D. The record abounds in evidence which confirms our conclusions that the imports from East and South were not of a size or quantity significantly to affect the results of the merger in the competitive situation which we have described in our opinion. Some of this is noted in the opinion where we referred to what happened to jobbers after the elimination of St. Helens as an independent supplier. These jobbers found themselves at a disadvantage not merely because they had to get their supplies from their competitor, but also because no satisfactory supplies could be procured from outside the Pacific coast area due to the time factor in obtaining deliveries which had to be made in spite of freight disadvantages in the long haul. The portion of petitioner's Stanford Research Institute's exhibit dealing with interregional movements of paper, including Table 75, indicates that the difference in coarse paper consumption and production in the western region taken as a whole is minimal. This suggests the impossibility of imports from eastern or southern sources amounting to any such figure as that asserted by petitioner.

4. In any event the competition of Los Angeles Paper Bag Co. lacks the significance attaching to St. Helen's competition, for this company purchased its bag paper almost exclusively from Crown.

a position to compete with Crown, all up and down the line, Crown's dominance of the market became overwhelming. This is true whether our computation of sales or that of Crown is to be accepted; for we cannot ignore what the merger did to production capacity in the relevant area as noted in our opinion. We cannot ignore the substantial testimony of jobbers and converters as to what happened to them after the merger when they lost their independent sources of supply from St. Helens, and had to look to Crown and its subsidiaries, which competed with them in their jobber and converter fields, for their supplies.

Finally, the petition for rehearing asserts that our decision is contrary to certain cited cases. We have difficulty in understanding why such cases are mentioned. Thus, Feil v. Federal Trade Commission, 9 Cir., 285 F.2d 879, has no resemblance whatever to this case aside from the fact that the respondent there was also the Federal Trade Commission.[5] We also find difficulty in understanding why the petitioner cites Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580, a case which clearly bears no resemblance to the present one. We have concluded that petitioner has cited it because the Tampa Electric case cited United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. Evidently the suggestion is that thereby the Court reapproved the Columbia Steel decision. But the Court in the Tampa Electric case cited Columbia Steel on a very limited point, namely, the point that foreclosure from 3 per cent of a market is not sufficient to injure a seller's competitors. Our original opinion adequately discloses why, in our view, the decision of the court in the Columbia Steel case is not pertinent here. (See the portion of our opinion following reference to footnote 10 and also our footnote 25.)

The petition for rehearing is denied.

5. That was a case reviewing an order of the Commission requiring a concern to cease and desist from certain advertising.